UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

TIMOTHY UPCHURCH,                    )
                                     )
              Plaintiff,             )
                                     )
         v.                          )      No. 1:19-cv-04644-SEB-MG
                                     )
INDIANA DEPARTMENT OF                )
CORRECTION,                          )
                                     )
              Defendant.             )

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Now before the Court is Defendant's Motion for Summary Judgment [Dkt. 130].

Plaintiff Timothy Upchurch has brought this action against his employer, Defendant

Indiana Department of Correction ("IDOC"), alleging that he was discriminated against

because of his race (African American) and subjected to unlawful retaliation in violation

of Title VII of the Civil Rights Act of 1964.  IDOC denies unlawfully discriminating or

retaliating against Mr. Upchurch.  For the reasons detailed below, Defendant's summary

judgment motion is <u>GRANTED</u>.

**<u>Factual Background</u>**[1]

Mr. Upchurch is a Correctional Officer at the Correctional Industrial Facility

("CIF") in Pendleton, Indiana, which facility is operated by IDOC.  IDOC is the largest

---

[1] The facts underlying this litigation are prolix and the parties' explications far from clarifying,
much less simplifying, in facilitating the Court's review.  As the finder of fact, we were faced
with a mystifying level of detail and complexity often with insufficient help from the lawyers.

state agency in the State of Indiana, operating other correctional facilities in addition to CIF, including the Indiana Women's Prison.  Mr. Upchurch, an African-American male, has been employed by IDOC since 1994 and has spent his entire work career at CIF.

Since 2006, Wendy Knight has served as the Warden of CIF.  As part of her duties, she is responsible for the administration and operation of CIF, including employment decisions as well as the care and custody of the inmates at CIF.  Dkt. 105-9, ¶ 3.  Warden Knight receives input and recommendations on certain employment decisions from the State Personnel Department, but ultimately exercises the decision-making authority for all personnel decisions at CIF, including hiring, promotion, and demotion determinations.  *Id.* ¶ 4.  Warden Knight has no responsibility for personnel decisions in any other IDOC correctional facilities.  Thus, she does not have the authority to block an employee's transfer to a different IDOC facility nor is her permission required to effect an employee's transfer from CIF to another facility.  *Id.* ¶¶ 49–50.

From May 2018 and throughout the time period relevant to this litigation, Andrew Cole served as the Deputy Warden of Operations at CIF.  As a part of his duties, Deputy Warden Cole oversaw and managed CIF employees, including assessing employee discipline.  Dkt. 105-1, ¶ 2.

**Defendant's Employment Policies**

Under IDOC's "Information and Standards of Conduct for Departmental Staff," IDOC staff members have an affirmative duty to be familiar with and to comply with standards of conduct and IDOC policies.  Dkt. 105-1 at 41, 45.  As part of IDOC's Code of Ethics, each employee must "maintain mutual respect and professional cooperation" in

their relationships with other IDOC staff members. *Id.* at 46. Under IDOC's policies, misconduct defined as "Dereliction/Neglect of Duty" includes but is not limited to a "failure to take appropriate action on an act or condition deserving attention," a "failure to report to duty at the time and place designated," and a failure to "strictly adhere to the Standards of Conduct and any and all other standards." *Id.* at 66–67. IDOC staff members are also required to be courteous, considerate, prompt, and respectful when interacting with other staff persons and to refrain from obscene, indecent, vulgar, rude, or abusive language. *Id*. at 67.

In the event an employee conducts themself in a manner unbecoming of staff, which includes "neglect of duty" and "discourtesy or insolence," the employee may be subject to disciplinary action. *Id.* at 73. A failure to work mandatory overtime or overtime shifts for which the staff person has volunteered may also result in disciplinary action. *Id.* at 57.

IDOC employees are also governed by the State of Indiana's zero-tolerance policy against violence, including intimidation, which is defined as "frightening or coercing by threat; or, expressions of hatred, contempt, disgrace, or ridicule." *Id.* at 119. IDOC employees are required to notify agency management of any actual violence or other behavior they consider violent and are admonished that words "spoken in jest or idle talk may be reasonably perceived by others as threatening." *Id.* at 119. The State also has a policy against harassment and discrimination due to race and color, among other such protected classes. *Id.* at 125. IDOC employees are encouraged to promptly report

violations of the standards of conduct and other state or departmental policy or procedure.
*Id.*

**Plaintiff's Employment History Prior to April 2018[2]**

As discussed above, Mr. Upchurch's employment with IDOC began in 1994 in the position of Correctional Officer.  On November 25, 2007, Mr. Upchurch was promoted to Sergeant, and, on September 13, 2015, was promoted again to Lieutenant.  Dkt. 105-5.  In May 2016, while serving as a lieutenant at CIF, Mr. Upchurch was awarded CIF's "Supervisor of the Year" designation, an accolade for which he was nominated by his peers and ultimately selected by a committee of administrative staff, including the Warden, Deputy Wardens, and Major.  Dkt. 105-1, ¶ 10.  In 2016 and 2017, Mr. Upchurch received several positive reports in his personnel file, including, among other things, entries stating that he possessed good teamwork and communication skills and knowledge of policies and procedures, had helped his team exceed expectations, and had once run the shift office for two weeks by himself during his supervisor's absence.  Dkt. 115-3, ¶¶ 65, 76.  In February 2017, Mr. Upchurch's performance appraisal for 2016 included several ratings of "Exceeds Expectations" and an overall rating of "Meets Expectations."  *Id.* ¶ 67. His performance appraisal for 2017, issued in January 2018, included several ratings of "Exceeds Expectations" and an overall rating of "Meets Expectations."  *Id.* ¶ 78.

---

[2] The period relevant to Mr. Upchurch's allegations in this lawsuit spans four years, dating back to the beginning of 2018 and running through January 28, 2022.  Given Mr. Upchurch's long tenure with IDOC, we have summarized the most relevant and recent information from his employment history prior to 2018.

CIF's disciplinary policies distinguish between formal and informal discipline, with ordinary written reprimands and letters of reprimand considered informal discipline and suspensions and "written reprimands in lieu of suspension" treated as formal discipline. Dkt. 105-1, ¶ 7. Throughout his lengthy tenure with CIF, Mr. Upchurch had on various occasions received formal and informal discipline; his most recent disciplinary action prior to 2018 occurred in August 2016, when he received an informal letter of reprimand for taking unauthorized leave. *See id.* ¶¶ 7–8.

**Plaintiff Not Selected for Promotion to Captain in April 2018**

In early 2018, a captain position opened up at CIF after the departure of the incumbent under whom Mr. Upchurch had been working in the shift supervisor office. Following his departure, Mr. Upchurch managed the shift office by himself for approximately two to three months before IDOC undertook the hiring process to fill the captain position. Mr. Upchurch applied for the open captain position in late March 2018 and was selected for an interview in April 2018.

Paul Parrow, a white male, who was then a lieutenant employed at IDOC's Miami Correctional Facility located outside of Kokomo, Indiana, also applied and was interviewed for CIF's open captain position. Dkt. 105-9, ¶¶ 9–10. The year prior, in 2017, Mr. Parrow had been awarded Supervisor of the Quarter at the Miami Correctional Facility. Mr. Parrow was also a 2017 graduate of the Experienced and Emerging Leadership Program and had received an overall performance rating of "Exceeds Expectations" in 2017. Dkt. 105-12; Dkt. 105-13; Dkt. 105-14.

5

Mr. Upchurch and Mr. Parrow were each interviewed by a panel comprised of three individuals: Major Charlie Fox, Deputy Warden Cole, and Unit Manager Dennis Reagle, all of whom are white men.  Following the interviews, Deputy Warden Cole reported on behalf of the panel their recommendation that Mr. Parrow be promoted to the position based on his work history and interview performance.  Dkt. 105-1, ¶¶ 11–12. Warden Knight also believed Mr. Parrow was the best candidate for the promotion based on a combination of factors, including the interview committee's recommendation, her personal knowledge of both of the candidates' work histories, and the strength of the two referrals from Mr. Parrow's supervisors at the Miami Correctional Facility.  She thus selected Mr. Parrow over Mr. Upchurch to fill the Captain position.  Dkt. 105-9 ¶¶ 14– 15.  Warden Knight and Deputy Warden Cole have both testified that race was not a consideration at any point in the selection process.  *Id.* ¶ 57; Dkt. 105-1, ¶ 12.

Mr. Upchurch has testified that he believes Mr. Parrow was selected because "it's a 'Good Old Boys System'" at IDOC, meaning that "a lot of times [IDOC] promotions are not based on … performance, but … on who you know."  Dkt. 105-2 at 78–79. According to Mr. Upchurch, Mr. Parrow was a good friend of Unit Manager Reagle, one of the interviewers, and was selected based on that relationship.  *Id.* at 79; Dkt. 115-3, ¶ 84.  When Deputy Warden Cole and Major Fox met in person with Mr. Upchurch to inform him that he had not been selected for the captain position, Mr. Upchurch expressed his concern regarding the lack of racial diversity in IDOC leadership position and complained that CIF was not hiring or promoting enough African American candidates.  *Id.* ¶ 81.  At that meeting, Mr. Upchurch specifically inquired, "At what point

are we going to get some [B]lack captains in here, or just more [B]lack supervisors?"
Dkt. 105-2 at 86–87.

On April 30, 2018, Warden Knight issued an email announcement to the CIF staff welcoming Mr. Parrow.  The email noted several grounds for his selection by the interview committee and by Warden Knight that had made Mr. Parrow the most qualified candidate for the position.  These qualifications included the various factors identified above along with his having run the Shift Supervisors Office for several months while the Miami Correctional Facility had been without a captain, making him "very well versed in running and putting together a shift for a very large facility." Dkt. 105-11.  Mr. Parrow began work in his new position at CIF on May 6, 2018.  *Id.*  According to Mr. Upchurch, because of his familiarity with CIF and his experience running the shift office, he was directed to train Mr. Parrow in the new position.  Dkt. 115-3, ¶ 85.

A few weeks after Mr. Parrow was hired, Mr. Upchurch complained to another CIF captain, Captain Lessley, and to Major Fox of race discrimination, based on CIF's hiring of Mr. Parrow and assignment of Mr. Upchurch to train him.  Mr. Upchurch reiterated his previous statement that CIF needed to promote more African American employees to lieutenant and captain positions.  *Id.* ¶ 86.

**Plaintiff's January 2019 Demotion**

The events leading to Mr. Upchurch's demotion in January 2019 began on November 18, 2018, when Mr. Upchurch, who was then a Lieutenant, was working at CIF alongside two Correctional Officers, Colin White and David Myers, both white males.  Mr. White and Mr. Myers were working together on the F Unit, and Mr.

Upchurch was the assistant shift supervisor serving under Captain Parrow.  In that role,

Mr. Upchurch's duties included oversight across all the units of CIF.  Mr. Myers called

Mr. Upchurch to request relief staff to cover his position so he could leave work to get a

haircut and a shoeshine.  Mr. Upchurch granted Mr. Myers's request with the approval of

Captain Parrow.  Upon the arrival of another officer, Jordan Farmer, to fill in for Mr.

Myers, Mr. Myers departed the F Unit.  Dkt. 105-2 at 109–110.

Later, when Mr. Myers returned to CIF, he came to the shift office, where Mr.

Upchurch and Captain Parrow were working, and ordered a pizza, with the approval of

Mr. Upchurch and Captain Parrow.  When he was notified that the pizza had arrived, Mr.

Myers walked to the front of the building to pick it up before returning to the shift office.

Mr. Myers then departed the shift office.  Thereafter, Mr. White phoned the shift office to

inform Mr. Upchurch that Mr. Myers had not yet returned to his position on the F Unit.

Later, Mr. White contacted the shift office a second time to report that Mr. Myers still

had not returned, whereupon Mr. Upchurch instructed Mr. White to draft an incident

report based on Mr. Myers having been absent from the F Unit for more than an hour.  At

this point, Captain Parrow called Mr. Myers on the radio to instruct him to return to the F

Unit, prompting Mr. Upchurch to phone back Mr. White to instruct him not to complete

the incident report because Mr. Upchurch in telling him to fill out the incident report had

only been "messing around with him."  According to Mr. Upchurch, this was the extent

of his interactions with Mr. White that day.  Dkt. 105-2 at 109–117.

Two days later, on November 30, 2018, Mr. White emailed Hannah Stultz, a

Human Resources Generalist-1 with the State Personnel Department, to report that he had

been subjected to a months-long campaign of harassment and bullying at the hands of Mr. Myers, including his repeated name calling; his waving a gun in Mr. White's face and mocking him after Mr. White had objected to the manner in which Mr. Myers was handling his weapon; his working with shift supervisors to get Mr. White assigned to undesirable posts; and, upon learning that Mr. White was transferring out of CIF, his stating that he was going to get Mr. White fired before the transfer.  Dkt. 105-17 at DOC200210_10749.

In his email to H.R., Mr. White also cited several specific comments that Mr. Myers had made to him on November 18, 2018, when White and Myers had worked together on the F Unit, including the following: "I hope you and your family all die in a car accident," "I hope your wife is out fucking another guy," and "I hope that your son grows up to call another man daddy."  Dkt. 105-16 ¶ 8; Dkt. 105-17 at DOC200210_10749.  Additionally, Mr. White accused Mr. Myers of having said, following his return to the F Unit and upon learning that Mr. White had reported his absence to Mr. Upchurch, "You're really filling out that incident report you little snitch!" Dkt. 105-17 at 3.  Mr. Myers told Mr. White that he had been with Mr. Upchurch the whole time, that they had "ordered pizza and [Mr. Upchurch] let me go and pick it up;" Mr. Myers then waved the pizza receipt in Mr. White's face.  Dkt. 105-17 at DOC200210_10750.  Sometime later, Mr. Upchurch called Mr. White to ask when the incident report would be completed, and, according to Mr. White, when he told Mr. Upchurch that Mr. Myers had said it was all a joke, Mr. Upchurch "laughed and hung up the phone."  *Id.*

9

On December 4, 2018, Ms. Stultz forwarded Mr. White's complaint to Warden Knight, who responded in relevant part, as follows: "If Lt. Upchurch did what is alleged[,] I am telling you now[,] I will look for demotion."  Dkt. 115-18.  Thereafter, Ms. Stultz commenced an investigation into the allegations of harassment and bullying, which process included interviewing the following six employees, each of whom reportedly had been involved in the incident: Mr. White, Mr. Myers, Mr. Parrow, Mr. Upchurch, Mr. Farmer, and another Correctional Officer, Ty Palmer.

During Mr. White's interview, he reiterated his allegations and confirmed the statements contained in the email he had originally sent to Ms. Stultz.  He also reported for the first time that he had been told that on November 18th, when Mr. Upchurch was working in the shift office, Mr. Myers had phoned Mr. Upchurch and stated that Mr. White "hasn't had sex with his wife since he got married," and continued to make fun of Mr. White.  Dkt. 105-16, ¶ 11.  Mr. White did not accuse Mr. Upchurch of having ever made any derogatory or harassing comments to him directly.  Mr. White did, however, report that on prior occasions he had told Mr. Upchurch about Mr. Myers's pattern of harassment and that Mr. Upchurch had failed to take any action to remedy the situation and that, in fact, "on multiple occasions what was reported to [Mr.] Upchurch g[ot] told to [Mr.] Myers."  Dkt. 105-17 at DOC190524_00005.

Mr. Myers denied making the statements attributed to him and both Mr. Upchurch and Mr. Parrow denied ever hearing about the comment Mr. Myers allegedly made on November 18th about Mr. White's sex life.  Mr. Upchurch also denied that Mr. White previously had ever reported his concerns to him regarding Mr. Myers's harassment.

When interviewed, Mr. Palmer corroborated portions of Mr. White's story regarding Mr. Myer's conduct on November 18th, admitting that he had been in the shift office when Mr. Myers called Mr. Upchurch and made the remark to Upchurch and "everyone else in the office" about Mr. White's sex life.  Dkt. 115-19 at 2.  (It is not clear from Mr. Palmer's report which, if any, other IDOC employees were in the office at the time this comment was made.)  Mr. Palmer said that at some later time when he saw Mr. White, he (Palmer) laughed and remarked, "I heard you haven't had sex with your wife since you got married?"  Dkt. 105-17 at DOC190524_00006.  Mr. Palmer also confirmed the report that Mr. Myers had said that he wished Mr. White's family would die in a car accident. *Id.*; Dkt. 105-16, ¶ 12.

Mr. Farmer, the officer who had covered Mr. Myers's post on November 18th, confirmed during his interview the details recounted in Mr. White's report, specifically, that Mr. Myers was gone for a "couple of hours" and that, when Mr. White called the shift supervisor's office to inquire as to Mr. Myers's whereabouts, Mr. Upchurch replied to Mr. White that he did not know where Mr. Myers was and that Mr. White should file an incident report.  Mr. Farmer also verified that, upon Mr. Myers's return to the F Unit, Mr. Myers informed Mr. White that he had gotten a haircut, ordered pizza, and ate it in the shift supervisor's office, calling Mr. White a "snitch," and telling him that the incident report had been a joke.  Dkt. 105-17 at DOC190524_00005.

Based on the reports from these interviews, Ms. Stultz found Mr. White's allegations truthful, with substantiation of the details by the other employees, and discussed her findings with her supervisors at the State Personnel Department and with

Warden Knight.  Ultimately, Ms. Stultz determined that "the investigation was able to confirm that Myers made inappropriate or threatening comments toward White," that "Upchurch made inappropriate comments regarding White to Palmer," and Mr. White's allegation that Mr. Upchurch "was aware of the situation and failed to intervene."  Dkt. 105-17 at DOC190524_00007.  On this basis, Ms. Stultz recommended that Mr. Myers be terminated and that Mr. Upchurch receive a two-step demotion from Lieutenant to Correctional Officer with a "written fact file entry regarding workplace harassment prevention policy."  Dkt. 105-16, ¶¶ 15–17; Dkt. 105-17 at DOC 190524_00007.

Upon reviewing Ms. Stultz's investigation and recommendations, Warden Knight concurred both in her findings and her recommendations, and made the decision to terminate Mr. Myers for his conduct and to demote Mr. Upchurch from the rank of Lieutenant to Correctional Officer.  Dkt. 105-9, ¶¶ 19–21.  Warden Knight viewed Mr. Upchurch's conduct as a violation of the standards of conduct governing IDOC employees, which standards, among other things, require staff members to maintain mutual respect and professional cooperation in relationships with other employees; impose an affirmative duty on staff members to report violations of the standards of conduct; and require staff members to take appropriate action on any act or condition deserving attention, such as reporting complaints. No other CIF employee, including Captain Parrow, received any discipline based on Mr. White's allegations regarding Mr. Myers's harassment and the events of November 18th.

On January 2, 2019, Warden Knight personally informed Mr. Upchurch of her decision to demote him and provided him a letter advising him that he was being

12

demoted for violating IDOC policy 04-03-103 Information and Standards of Conduct for Departmental Staff.  Dkt. 105-18.  The letter did not specify which provision(s) of the 34-page policy Mr. Upchurch was determined to have violated.  When Mr. Upchurch asked for clarification from Warden Knight concerning his actions that she believed warranted a two-step demotion, Warden Knight responded by simply stating that CIF believed Mr. White over Mr. Upchurch.  Dkt. 105-2 at 125.  According to Warden Knight's testimony, the demotion was based on Mr. Upchurch's failure to address the peer-to-peer harassment between Mr. Myers and Mr. White.  Dkt. 105-  Mr. Upchurch again raised the issue at his meeting with Warden Knight of the lack of African Americans in supervisor positions at CIF, stating, "You're demoting me, but we already don't have a lot of [B]lack supervisors as it is, we don't have [B]lack supervisors."  Dkt. 105-2 at 127.  According to Warden Knight, at the time she made the decision to demote Mr. Upchurch, she was unaware of any prior complaints by him regarding race-based discrimination or other race-related issues at CIF.  Dkt. 105-9, ¶¶ 24–25.

**Plaintiff's Post-Demotion Civil Service Complaints and Discipline**

On January 6, 2019, Mr. Upchurch filed a formal civil service complaint for race discrimination based on his demotion, which, after review, was denied by Warden Knight on January 24, 2019.  That same day, Mr. Upchurch was assigned to perform mandatory overtime, which he was unable to accept due to his childcare duties.  He refused to provide the overtime work, even though he did not have "refusals" available to him.  He asserts that he had previously informed CIF of his childcare obligations, which generally foreclosed his availability to perform unannounced mandatory overtime.  Dkt. 105-2 at

128–39.  Five days later, on January 29, 2019, CIF again assigned Mr. Upchurch to perform mandatory overtime, and he again refused to do so, despite knowing that he did not have "refusals" available to him.  *Id.*  Mr. Upchurch concedes that when he refused to perform overtime hours on these two occasions he knew he did not have available refusals, but he rejoins that these assignments were not justified because he had not received advance notice of them, which would have allowed him to arrange childcare, and in any event, the sergeant who assigned him the mandatory overtime was not authorized to do so.  *Id.* at 139–40.

Less than a week later, on February 4, 2019, Mr. Upchurch filed his second step complaint for discrimination.  Dkt. 115-25.  Thereafter, on February 20, 2019, Mr. Upchurch inquired of Deputy Warden Cole as to the reason for his demotion, to which Deputy Warden Cole replied that Mr. Upchurch should discuss the matter with Warden Knight.  Dkt. 115-3, ¶¶ 142–143; Dkt. 115-25; Dkt. 115-28.  Later that same day, Deputy Warden Cole issued a written reprimand to Mr. Upchurch, in lieu of a one-day suspension, for failing to work the mandatory overtime on January 24 and 29.  Deputy Warden Cole never mentioned the unauthorized leave issue to Mr. Upchurch prior to Mr. Upchurch's inquiry about his demotion.  Dkt. 115-29.

Mr. Upchurch sent an email to Warden Knight on February 26, 2019, requesting a meeting to discuss the reason for his demotion, as suggested by Deputy Warden Cole. Mr. Upchurch avers that when he met with Warden Knight, he was told that he had been demoted because he had been a hindrance ever since she came to CIF.  Dkt. 115-3, ¶¶ 148–49.

On March 5, 2019, Mr. Upchurch filed his third step complaint of discrimination. Dkt. 115-31.  Thereafter, on March 26, 2019, Deputy Warden Cole issued to Mr. Upchurch another written reprimand, in lieu of a three-day suspension, for having taken one-half hour of unauthorized leave by being late on March 6, 2019, the day after he had filed his third-step discrimination complaint.  Prior to issuing this reprimand, Deputy Warden Cole had never directly spoken to Mr. Upchurch about his unauthorized leave, and, despite having the discretion to change the leave from "unauthorized" to "authorized," he refused to do so.  Dkt. 115-3, ¶¶ 152, 157–158; Dkt. 115-35.

Mr. Upchurch recounts that on July 3, 2020, he sent an email to Deputy Warden Cole and Major Fox reporting harassment by Captain David Ridgway, who had assigned him to unnecessary training and also acted disrespectfully towards him in telling him to "be a man." Dkt. 115-3, ¶¶ 174–179; ¶ 241.  Mr. Upchurch stated in this email that he "was having medical issues and was stressed out."  He requested that Captain Ridgway's conduct be addressed as soon as possible.  However, neither supervisor responded to his messages.  *Id.* ¶ 242.  On July 8, 2020, Mr. Upchurch forwarded a copy of his email to Cole and Fox to H.R. Representative Abigail Pond, but Ms. Pond never responded to it. *Id.* ¶¶ 244–245.  Mr. Upchurch avers in this litigation that Captain Ridgway did not treat white employees in so disrespectful a manner as he was treated, but it is not clear from the record before us whether Mr. Upchurch specifically referenced race in his email messages or complained only of the harassment in general.

On July 12, 2020, Mr. Upchurch phoned in to request a day of personal leave, which he was in need of due to Captain Ridgway's continued harassment, but his leave

request was denied.  He took the leave anyway.  On July 17, 2020, Deputy Warden Cole issued Mr. Upchurch another written reprimand, in lieu of a five-day suspension, for having taken unauthorized leave on June 25 and July 12, 2020.

In January 2021, regrettably, Mr. Upchurch contracted COVID, requiring him to be off work for approximately one month.  Within one week of his return to work on February 3, 2021, Mr. Upchurch received a ten-day suspension for possession and use of tobacco at CIF.  *Id.*  Mr. Upchurch cites this incident as entirely contrived or concocted because he does not even use tobacco and did not bring tobacco into the facility, and in any event, he was still recovering from COVID and having trouble breathing at the time, which proves his point, he says.

**Plaintiff's Applications Since His Demotion**

Following his demotion in January 2019, Mr. Upchurch has applied for various other positions within IDOC as well as positions with other Indiana departments and agencies but has never been selected for any of the positions for which he has applied. According to CIF, throughout Warden Knight's tenure, CIF maintained a policy whereby employees were not eligible for a promotion (or transfer) within twelve months of their most recent formal discipline.  Dkt. 105-1, ¶ 23; 105-9, ¶¶ 30–33.  As detailed above, Mr. Upchurch was formally disciplined on March 26, 2019, July 17, 2020, and February 3, 2021.  Accordingly, pursuant to CIF's policy, he was ineligible for promotion at CIF from March 26, 2019 through March 26, 2020 and from July 17, 2020 through February 3, 2022.  Dkt. 105-9, ¶¶ 34–35; Dkt. 105-1, ¶ 8.  During those time periods, Mr. Upchurch unsuccessfully applied for a total of six positions with CIF.  Dkt. 105-19.

16

On June 28, 2020, Mr. Upchurch did apply for two positions at CIF for which he was eligible because he had not received formal discipline within one year of the application, to wit, a correctional lieutenant position and a correctional captain position. However, he was again not selected for either position.  The reason provided for the selection of the two successful candidates—Brandon Richey and Jerry Gilley, both white males—and not Mr. Upchurch, was that the other two were better qualified candidates. Dkt. 105-9, ¶¶ 35–39.  Specifically, Mr. Richey, who was chosen to fill the lieutenant position, had been a sergeant at the Pendleton Correctional Facility, a maximum-security facility operated by IDOC, and thus had experience managing high-risk offenders. According to Warden Knight, such experience was desirable because CIF's population of high risk and violent offenders was increasing at the time Mr. Richey was selected for the position.  *Id.* ¶ 38.  Mr. Gilley, who was selected for the open captain position, had previously served as a captain at CIF before transferring to the Pendleton Correctional Facility; therefore, in Warden Knight's opinion, he would be able to "immediately hit the ground running when he returned to the captain position at CIF."  *Id.* ¶ 39.  Mr. Upchurch testified that he believes the real reason that he was not awarded either of these promotions is that Warden Knight is a "racist" who "doesn't promote African Americans to positions."  Dkt. 105-26 at 16–18.

Mr. Upchurch also applied for positions with other IDOC facilities, including the Indiana Women's Prison ("IWP") and the Miami Correctional Facility ("MCF"). However, IWP, like CIF, has a policy whereby it does not accept transfers from other facilities if the candidate has received a suspension or written reprimand in lieu of a

suspension within a year of the application.  Thus, by virtue of this policy, Mr. Upchurch was ineligible to transfer to IWP from March 26, 2019 through March 26, 2020 and from July 17, 2020 through February 3, 2022.  Although he had applied for two positions with the IWP during the periods he was ineligible, he also applied for four positions with the IWP (sergeant, lieutenant, captain, and caseworker) for which he was eligible, but was not selected for any of those positions.  The individuals selected for those positions were Sarah Breeden, Sarah Shulz, Jason Durr, and Shanice Swygert, respectively.  Dkt. 105-19.  Mr. Upchurch also applied but was not selected for a lieutenant position at MCF.  On another occasion, MCF did offer Mr. Upchurch a correctional officer position, but he declined to accept it.  Dkt. 105-26 at 32–33. Mr. Upchurch has also applied for several parole officer positions since his demotion by IDOC but has not been selected for any of those positions.  Dkt. 105-19.

Mr. Upchurch claims that Warden Knight contacted the wardens at other IDOC facilities and instructed them not to hire him, which he believes is a common practice within IDOC.  Dkt. 105-26 at 19–20.  He admits, however, that he has no proof of such communications by Warden Knight, nor does he possess any specific information or knowledge that such communications actually occurred.  *Id.* at 20, 23, 24, 31.[3]  Warden

---

[3] Mr. Upchurch also cites the fact that he has applied for and not been awarded several positions with state agencies other than IDOC, including at the Department of Child Services as a family case manager.  There is no evidence that Warden Knight or any other IDOC supervisor was involved in any way in these hiring decisions.  Accordingly, we do not address these decisions further.

Knight denies having contacted other wardens about Mr. Upchurch for any purpose.  Dkt. 105-9, ¶¶ 45–48.

**Similarly Situated Employees**

Mr. Upchurch has identified several IDOC employees whom he views as similarly situated comparators outside his protected class who were treated more favorably than he was.  We summarize below the details of each comparator as referenced in Mr. Upchurch's brief in opposition to summary judgment:[4]

*Mark Delph*

CIF promoted Mark Delph to the rank of Sergeant and shortly thereafter issued a written reprimand to him for slapping a male officer on the buttocks.  Mr. Delph's promotion was rescinded following the incident, but having received only informal, rather than formal discipline for the slap, he remained eligible for promotion.  CIF returned Mr. Delph to the rank of Sergeant within six weeks of his having received the written reprimand.

*Joshua Mills*

On September 22, 2019, Joshua Mills transferred from the Pendleton Correctional Facility to CIF to become a Sergeant.  According to Mr. Mills's personnel file, while

---

[4] Mr. Upchurch includes in his designation of evidence in opposition to IDOC's summary judgment motion a "Summary of Comparators by Actions" and a "Summary of Employees Treated Better on Discipline" in which he addresses more than twenty-five IDOC employees whom he contends were treated more favorably.  These summary submissions include facts and legal arguments not included in his summary judgment briefing.  Because Mr. Upchurch's attorney did not seek leave from the Court to supplement his briefing and/or to file an oversized brief, we will consider here only those legal arguments and comparators included in the briefing.

employed at the Pendleton Correctional Facility, he had received a letter of discipline for a three-shift suspension on August 19, 2019, approximately one month prior to his transfer.  Dkt. 115-50 at 31.  It is not clear whether Warden Knight was aware of Mr. Mills's discipline at the time of his transfer to CIF.

*Ty Palmer*

As discussed above, Mr. Palmer, a CIF Correctional Officer, was present in the shift supervisor's office at the time Mr. Myers made the derogatory comments regarding Mr. White in the presence of Mr. Upchurch.  When interviewed as part of the investigative follow up to Mr. White's complaint, Mr. Palmer admitted having repeated Myers's derogatory comment to Mr. White regarding White's sex life.  Mr. Palmer was not disciplined by CIF for his involvement in this incident.

*Paul Parrow*

Mr. Upchurch contends that Mr. Parrow engaged in misconduct equal to or worse than the conduct for which Mr. Upchurch was disciplined yet received more lenient treatment.  First, following the November 2018 incident for which Mr. Upchurch was demoted two ranks, Mr. Parrow was not disciplined, despite the fact that he was the Captain on duty and may have been present in the shift supervisor's office at the time Mr. Myers made the derogatory comments regarding Mr. White's sex life.

Second, in 2020, CIF demoted Mr. Parrow three ranks from Captain to Correctional Officer based on various infractions, including kissing a female officer in her office during work hours; sending nonwork communications while on duty to family and friends at MCF and CIF; using state resources to complete college coursework; and

using the login credentials of other IDOC employees to complete training modules for them.  Dkt. 115-40.  Following his 2020 demotion, Mr. Parrow subsequently left his employment with IDOC and transferred to a position at the Indiana Department of Transportation ("INDOT").  Dkt. 115-50 at 73; Dkt. 115-53 at 2.  Apart from confirming Mr. Parrow's transfer date with INDOT, no evidence establishes that Warden Knight or any other CIF administrative staff member was involved in INDOT's hiring process or the decision making leading up to his selection for the position.[5]

*Jared Raines*

While serving as a Correctional Officer, Jared Raines received a fact file entry in his personnel file on June 16, 2019, for having cursed over the radio.  On August 14, 2019, he received a written reprimand for failing to give offenders a bathroom break within a two-hour time window.  Because Mr. Raines was only informally disciplined for these infractions, he remained eligible for promotion, and CIF promoted him to the rank of Sergeant on August 25, 2019.

*Colin White*

On December 10, 2018, shortly after having reported Mr. Myers's harassment and Mr. Upchurch's failure to take steps to remedy the harassment, Mr. White was allowed to

---

[5] Mr. Upchurch cites the fact that, after Mr. White transferred from CIF to another IDOC facility, Mr. White was investigated and ultimately terminated for, among other things, ghost employment.  As part of the investigation, Mr. White stated that Mr. Parrow, his supervisor at CIF, had permitted him to leave early without officially taking leave.  Mr. Upchurch cites this as additional evidence of Mr. Parrow's more favorable treatment, but there is no evidence that any decisionmaker at CIF knew anything about this when Mr. Parrow and Mr. White were still working at CIF.

transfer from CIF to the position of Recreation Leader at the Plainfield Correctional Facility, also called the Indiana Youth Center, despite having taken unauthorized leave in November 2018.  In an email dated November 12, 2018, Mr. White explained to Major Fox that four days prior, he had taken 11.5 hours of leave on the advice of his doctor.  Mr. White stated that he had been confused as to the sick time he had available; he apologized and requested that his leave be switched to "authorized" as he had secured a doctor's note.  It is not clear whether that request was ever granted.  The record includes no other specifics regarding Mr. White's having taken unauthorized leave or receiving discipline for doing so, although Mr. Upchurch testified generally that in his role as Lieutenant, he was aware that Mr. White had "accrued a lot of ULs, unauthorized leave." Dkt. 105-2 at 106.  In March 2019, a few months after Mr. White transferred from CIF, IDOC terminated him following an investigation that revealed that he had been lying and falsifying his hours while employed at the Plainfield Correctional Facility.  Dkt. 115-32 at 2; Dkt. 115-33.

**The Instant Litigation**

This lawsuit was initiated on November 21, 2019, via Mr. Upchurch's original complaint against the State of Indiana, asserting violations of Title VII's anti-discrimination and anti-retaliation provisions based on his having filed an EEOC charge and receiving a notice of right to sue.  Mr. Upchurch subsequently amended his complaint (March 24, 2020), to add allegations of unlawful discrimination and retaliation against the State.

A year later, on March 8, 2021, Mr. Upchurch filed a second complaint under a separate cause number, 1:21-cv-00551-SEB-MJD, and on September 1, 2021, he filed an amended complaint in that cause.  On November 4, 2021, Mr. Upchurch moved to consolidate the two pending cases, which motion was granted by the Court.  Following argument on the consolidation issue, the Court directed that the issues to be resolved in this litigation are limited to the facts occurring on or before January 28, 2022.  Mr. Upchurch's motion to stay this case to permit the addition of future claims arising after that date was denied.  Dkt. 99; Dkt. 124.

On March 30, 2023, in a written order (Dkt. 128), the Court substituted IDOC for the State of Indiana as the defendant in this action.  IDOC's renewed motion for summary judgment is now fully briefed and ripe for ruling.

## Legal Analysis

### I.   Summary Judgment Standard

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant.  *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

## II.    Discussion

In this lawsuit, Mr. Upchurch claims that his January 2019 demotion and failures thereafter to receive any promotion at CIF or a transfer to another position at other IDOC facilities for which he has applied was the result of discriminatory and retaliatory animus in violation of Title VII.[6]  An analysis of these claims invokes the Seventh Circuit's decision in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), which states that, regardless of whether the court uses the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) or some other framework to evaluate a plaintiff's employment discrimination claims, "the ultimate legal question 'is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'"  *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765).  Under this "simplified" approach, the "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence."  *Ortiz*, 834 F.3d at 765.

Here, Mr. Upchurch's opposition to IDOC's summary judgment motion as to the Title VII claims is based on his contention that, viewing the evidence holistically, a

---

[6] Mr. Upchurch concedes that the legal claims he may bring in this case are limited to those accruing on or after July 12, 2018, 300 days prior to the filing of his first EEOC charge on May 8, 2019.  Accordingly, a separate Title VII claim based on the hiring of Paul Parrow as captain at CIF in April 2018 is not available to him.  Mr. Upchurch argues that CIF's failure to promote him to the captain position nonetheless is relevant and admissible as background evidence of discrimination in support of his timely-filed Title VII claims.  We address that argument below.

reasonable fact finder could conclude that his January 2019 demotion and his failure to receive a promotion or transfer position since his demotion was because of his race and in retaliation for his having complained of discrimination.  We follow his lead in structuring our analysis of his Title VII claims.  *See Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 880 (7th Cir. 2016) (suggesting that the court need not address the *McDonnell Douglas* framework when the plaintiff does not utilize it in response to a summary judgment motion).

### A.     April 2018 Failure to Promote

Before addressing his legal claims, we turn to Mr. Upchurch's allegations regarding CIF's April 2018 failure to promote him to the position of captain.  According to Mr. Upchurch, he was more qualified for that position than Mr. Parrow, the white lieutenant who was chosen over him, and he believes Mr. Parrow was selected due to his personal friendship with one of the members of the interview committee.  Although Mr. Upchurch concedes that a separate legal claim based on this incident is foreclosed because of his failure to file a timely EEOC charge, he characterizes these facts as relevant background in resolving whether his subsequent demotion was the result of a discriminatory animus.  It is true that employees may under some circumstances use untimely acts of discrimination as background evidence in support of a timely claim, *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 113 (2002), but there is no evidence here that CIF's decision to select Mr. Parrow rather than Mr. Upchurch was a discriminatory action.

The three-person committee interviewed both Mr. Parrow and Mr. Upchurch, ultimately recommending the selection of Mr. Parrow to fill the vacancy based on his work history and interview performance.  Warden Knight testified that she selected Mr. Parrow for the position because she believed he was the best candidate, citing as her reasons those relied upon by the interview committee as well as the strong recommendations from Mr. Parrow's former supervisors.  In a failure to promote context, the Seventh Circuit has held that where, as here, the employer's proffered non-discriminatory reason for its employment decision "is that it selected the most qualified candidate, evidence of the applicants' competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." *Mlynczak v. Bodman*, 442 F.3d 1050, 1059 (7th Cir. 2006) (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir. 2002)).

No such disparity exists here.  In fact, Mr. Parrow and Mr. Upchurch possessed very similar qualifications—both were serving as lieutenants who performed on a temporary basis the duties of captain at their respective correctional facilities and each had received largely comparable awards and performance reviews during their employment with IDOC.  While Mr. Upchurch argues that he was better qualified for the captain position due to his familiarity with CIF, such experience does not constitute so clearly a superior qualification that there could be "*no dispute* among reasonable persons of impartial judgment that [he] was clearly better qualified." *Robertson v. Dep't of*

*Health Servs.*, 949 F.3d 371, 381 (7th Cir. 2020) (quotation marks and citation omitted) (emphasis in original).

Mr. Upchurch testified as to his personal belief that Mr. Parrow was selected "primarily because" of his relationship with a member of the hiring committee and a "Good Old Boys System" at CIF whereby employees are promoted "not based on … performance, but … based on who you know." (Dkt. 105-2 at 78)  Even if true, that reason is not on its face a race-based reason.  Beyond his observations regarding an overall shortage in the number of African American supervisors above the lieutenant level at CIF, Mr. Upchurch has adduced no evidence to support an inference that, in selecting Mr. Parrow to fill the captain position, Warden Knight did not honestly believe that he was the better candidate and instead made her decision based on Mr. Upchurch's race.  Accordingly, we do not regard CIF's failure to select Mr. Upchurch for the captain position in April 2018 as probative of his other claims directly at issue in this litigation.

## B.    January 2019 Demotion

### 1.    Discrimination

Mr. Upchurch contends that CIF discriminated against him based on his race in violation of Title VII when Captain Knight demoted him two ranks from lieutenant to correctional officer in January 2019.  IDOC argues that it is entitled to summary judgment on this claim because the uncontroverted evidence establishes that the decision to demote Mr. Upchurch was based, not on race, but on Mr. Upchurch's failure to address peer-to-peer harassment between his subordinates, in violation of IDOC's standards of

conduct.  Mr. Upchurch asserts, however, that a reasonable jury, viewing the evidence as a whole, could conclude that he was demoted because of his race.

In support of his argument, Mr. Upchurch contends that the evidence establishes relevant background facts that support an inference of discrimination, namely, that CIF had not promoted any African American above the rank of lieutenant for many years, and that when it had the opportunity to promote him to the position of captain, it selected instead a less-qualified, white lieutenant for the position.  Mr. Upchurch thus contends that a reasonable jury could find that his two-step demotion, which occurred approximately six months later, was discriminatory in light of the following evidence: the purported weaknesses in the investigation that culminated in his demotion, the fact that two white employees also involved in the incident were not disciplined, and Warden Knight's statement to Ms. Stultz before the investigation was complete that she would "look for" Mr. Upchurch's demotion if the allegations were proved true, and her comment to Mr. Upchurch that she had demoted him because he had been a "hindrance" to her ever since she began working at CIF.

This evidence upon which Mr. Upchurch relies, however, in our view does not support his claim that his demotion was racially discriminatory.  CIF maintains that Mr. Upchurch was demoted following an investigation into a harassment complaint made by Mr. White against Mr. Myers that revealed that Mr. Upchurch had failed to address peer-to-peer harassment of his subordinates, which was a violation of CIF's standards of conduct.  When interviewed by Ms. Stultz as part of the investigation into his complaint, Mr. White reported that he had been harassed for several weeks by Mr. Myers and that he

28

had informed Mr. Upchurch of the harassment, but that Mr. Upchurch had failed to address the matter and that he had, instead, repeated the information to Mr. Myers each time Mr. White complained.  Mr. White further reported that he had been told that Mr. Myers had called the shift office on November 18th and remarked to Mr. Upchurch that Mr. White had not had sex with his wife since he got married.

Although Mr. Upchurch denied having heard that comment by Mr. Myers about Mr. White's sex life or having repeated it to anyone, another correctional officer, Mr. Palmer confirmed that Mr. Myers had called Mr. Upchurch and made the comment to Upchurch and "everyone else in the office," though he did not identify the officers who were present in the office at the time.  Mr. Parrow, who was in the shift office on November 18th though not specifically identified as one who had heard the derogatory comment about Mr. White, was also interviewed as part of the investigation, and confirmed that he had authorized Mr. Myers to order pizza on November 18th, though he denied any knowledge of the sex life comment.  Based on these interviews, Ms. Stultz recommended that Mr. Myers be terminated, and that Mr. Upchurch be demoted two ranks from lieutenant to correctional officer and be given a "written fact file entry regarding workplace harassment prevention policy."  Warden Knight followed Ms. Stultz's recommendation and demoted Mr. Upchurch in January 2019, for violating IDOC policy 04-03-103 Information and Standards of Conduct for Departmental Staff.

We need not attempt to resolve any underlying conflicts in the various accounts of this incident.  What matters here in terms of the issues the Court must resolve is whether Mr. Upchurch's demotion was based on a racially discriminatory basis.  These facts as

outlined in Ms. Stultz's investigation summary support a finding that the CIF's proffered non-discriminatory reason for Mr. Upchurch's demotion, to wit, that he failed to address peer-to-peer harassment, was not based on Mr. Upchurch's race.  Although Mr. Upchurch emphasized in his arguments that his demotion letter does not specify which portion of the 34-page policy he was alleged to have violated, it remains undisputed that that policy, among other things, imposed an affirmative duty on staff members to report violations of the standards of conduct and required staff members to take appropriate action on any act or condition deserving attention, such as reporting complaints.  Thus, the demotion letter issued to Mr. Upchurch was not inconsistent with Warden Knight's testimony explaining that her decision to demote Mr. Upchurch was based on his failure to report peer-to-peer harassment.  Moreover, though Mr. Upchurch has denied Mr. White's allegations, he admits in his deposition that, if Mr. White's allegations were deemed to be true, he would have been required to report such harassment to a superior.  We are not faced here with a situation where the employer's proffered nondiscriminatory reason for a disciplinary decision "is without factual basis or is completely unreasonable," sufficient to support the inference "that an employer might be lying about its true motivation."  *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 646 (7th Cir. 2013).

In further support of his claim that this demotion decision was discriminatory, Mr. Upchurch focuses on whether IDOC was justified in crediting Mr. White's and Mr. Palmer's statements regarding Mr. Myers's harassment, arguing that IDOC should instead have credited his word and that of Mr. Myers and Mr. Parrow, each of whom denied making, hearing, or repeating any comment regarding Mr. White's sex life.  Mr.

Upchurch characterizes Mr. White and Mr. Palmer as relatively new, low-level correctional officers who had a motive to lie—i.e., Mr. White wanted to transfer out of CIF and Mr. Palmer had previously been disciplined by Mr. Upchurch—while Mr. Parrow and Mr. Upchurch as senior officers with many years of experience were much more credible witnesses.

In the words of the oft-repeated maxim, however, the Court does not sit as a "super personnel review board that second-guesses an employer's facially legitimate business decisions." *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008) (quotation marks and citation omitted). It is therefore beyond our purview to critique the underlying investigation and substitute our own assessments regarding the credibility of witnesses' statements for those of the employer. Our focus is limited to determining whether evidence exists that casts suspicion on the veracity of the proffered reason(s) behind the employer's decision.

Mr. Upchurch contends that he has adduced sufficient evidence on the basis of which a reasonable jury could conclude that Warden Knight's decision to demote him for failing to report peer-to-peer harassment was not honest, that it was instead a pretext for discrimination. He cites the lack of African American supervisors above the rank of lieutenant during Warden Knight's tenure, his failure to be promoted to captain in April 2018 (the weaknesses of which evidence we have already addressed above), evidence that Warden Knight prejudged the investigation before it was completed by informing Ms. Stultz that if Mr. White's allegations were true, she would be looking to demote Mr. Upchurch, Warden Knight's comment to Mr. Upchurch that she had demoted him

because he was a hindrance to her, and Warden Knight's failure to discipline either Mr.

Parrow or Mr. Palmer for the November 18th incident, despite their having engaged in

comparable or arguably more serious misconduct.[7]

    We agree with Mr. Upchurch's contention that evidence that a decisionmaker

made her decision on the final issues before her prior to completing an investigation of

the allegations against an employee could in certain cases support an inference of her

acting out of a discriminatory animus.  However, the email Mr. Upchurch cites in support

of his contention that Warden Knight made the demotion decision before the

investigation was performed merely reflects that Warden Knight had indicated to Ms.

Stultz that, *if* Mr. White's allegations were true, she would look to demote Mr. Upchurch.

This does not establish that she had prematurely reached a conclusion as to the

truthfulness of the witnesses or that a demotion was a foregone conclusion.  In a similar

vein, Warden Knight's alleged statement to Mr. Upchurch that she had demoted him

---

[7] Mr. Upchurch also references what he describes as discrepancies in the investigation as additional evidence of discrimination, claiming that Ms. Stultz's conclusion in her investigation summary that "the investigation confirms Upchurch made inappropriate comments regarding White to Palmer," is inaccurate since only Mr. Myers had made the derogatory comment to Mr. Upchurch, and Mr. Upchurch had not repeated that comment to anyone else.  Even assuming Ms. Stultz inaccurately summarized this part of the underlying investigation, it does not erode the proffered fact that Mr. Upchurch was demoted for his failure to address peer-to-peer harassment, rather than for engaging directly in any harassing behavior.  Accordingly, this inaccuracy is not probative of discrimination.  Mr. Upchurch also alleges that Mr. White's allegation in his interview that Mr. Myers made the sex life comment to Mr. Upchurch contradicts Mr. White's original complaint, stating that Mr. Myers made that comment to Mr. White, not Mr. Upchurch.  However, this is not factually correct.  Mr. White did not include any allegation regarding the sex life comment in his original emailed complaint to Ms. Stultz; thus, his interview does not contradict what he included in his complaint, but instead merely expands upon it.  Without evidence that CIF told Mr. White what to say or otherwise coached Mr. White prior to his interview, the fact that he expanded upon his complaint in the subsequent investigation does not support a finding of discrimination on CIF's part.

because he had been a hindrance to her since she came to CIF falls short as probative evidence due to its ambiguity.  On its face, this statement does not provide proof that Mr. Upchurch's race was the reason behind his demotion.

In some cases, a jury could reasonably infer pretext based on evidence of unequal discipline or an employer's selective enforcement of a disciplinary policy.  *See Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 915–16 (7th Cir. 2010).  The adduced evidence before us here, however, does not give rise to or otherwise support such a conclusion. Mr. Upchurch has identified Mr. Palmer and Mr. Parrow as similarly situated comparators, based on the fact that neither of them, as white employees, received any discipline regarding the November 18th incident, even though Mr. Palmer admitted to having repeated the sex life comment to Mr. White and laughing, and even though Mr. Parrow, whom Mr. Upchurch claims was present in the supervisor's shift office when the offending comment was allegedly made, failed to address it.  These disparities, he argues, support an inference of discrimination.

The purpose of the similarly-situated analysis "is to eliminate other possible explanatory variables, 'such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable'—discriminatory animus." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)).  Thus, similarly-situated employees "must be directly comparable to the plaintiff in all material respects, but they need not be identical in every conceivable way." *Id.* (citations and quotation marks omitted).  "In the usual case a plaintiff must at least show that the comparators (1) 'dealt with the same

supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Id.* at 847 (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)).

Applying these principles to the case before us, Mr. Parrow and Mr. Upchurch cannot properly be considered similarly-situated comparators.  Mr. Upchurch was a lieutenant at the time of the incident and thus was a supervisor to Mr. Myers and Mr. White, whereas Mr. Palmer was a correctional officer.  As such, they had differing duties, responsibilities, and supervisors and therefore cannot be considered "directly comparable … in all material respects." *Id.* at 846.  These are not insignificant differences in their roles.  Thus, the fact that Mr. Upchurch was demoted for failing to address peer-to-peer harassment, one of his specific job duties, while Mr. Parrow was not disciplined for repeating a derogatory comment to a co-worker is not probative of discrimination.

IDOC's failure to discipline Mr. Parrow at all, however, is a closer question.  Like Mr. Upchurch, Mr. Parrow was a supervisor at the time of the incident.  Viewing the facts in a light most favorable to Plaintiff, we assume that Mr. Parrow was present in the supervisor's shift office at the time Mr. Myers telephoned Mr. Upchurch and made the derogatory comment about Mr. White's sex life.  However, neither Mr. White nor Mr. Palmer ever specifically alleged that Mr. Parrow actually heard or repeated the comment at the time.  Additionally, Mr. White has testified that, although he told Mr. Upchurch about Mr. Myers's harassment on multiple occasions prior to November 18th, Mr. Upchurch never addressed the situation; in fact, he compounded the offense by passing

34

along Mr. White's complaints to Mr. Myers.  Mr. White made no such allegations against Mr. Parrow.  It is clear, therefore, that Mr. Upchurch's conduct differed in a material way from Mr. Parrow's.  Accordingly, Mr. Upchurch's demotion for failing to address peer-to-peer harassment compared to Mr. Parrow's lack of discipline does not support an inference of discrimination.

In 2020, Mr. Parrow was demoted three steps from captain to correctional officer, rather than fired, after an investigation revealed that he had kissed a female officer in her office during work hours; had sent nonwork communications while on duty to family and friends at MCF and CIF; had used state resources to complete college coursework; and had used the login credentials of other IDOC employees to complete training modules for them.  Assuming these facts were true, they do not support an inference that Mr. Upchurch's two-step demotion was racially discriminatory.  Mr. Upchurch maintains that if race had not been a factor in IDOC's decision making, Mr. Parrow would have been terminated for his conduct; that he was not is evidence that Mr. Parrow was treated more favorably.  While we agree with Mr. Upchurch that the conduct for which Mr. Parrow was demoted could fairly be construed as more egregious than his, Mr. Parrow was also disciplined more severely than Mr. Upchurch, given that Mr. Parrow received a three-step demotion compared to Mr. Upchurch's two-step demotion.  Accordingly, we find that this comparison does not provide proof that a similarly-situated white employee received more favorable treatment than that accorded to Mr. Upchurch, as an African-American man.

Nor are we persuaded by Mr. Upchurch's contention that, when considered in combination with the entirety of the above-outlined evidence, CIF's failure to reverse his demotion after Mr. White's transfer to another IDOC facility and subsequent termination for lying and ghost employment, raises an inference of race-based discrimination.  The finding that Mr. White lied on some later occasion unrelated to the November 2018 events as determined by different supervisory decisionmakers during his employment at a different facility does not erode the truthfulness of the representations in his November 2018 report or the non-discriminatory reasons for CIF's decision.  An employer has no legal duty to revisit or reverse previously imposed discipline where subsequent circumstances might call it into question.

In sum, the evidence adduced by Mr. Upchurch as support for his discriminatory demotion claim, when viewed as a whole, does not suffice as a basis on which a reasonable jury could conclude that he was demoted because of his race, rather than for his failure to address the workplace incident involving peer-to-peer harassment. Accordingly, Mr. Upchurch's Title VII discrimination claim based on his January 2019 demotion does not survive summary judgment.

### 2.  Retaliation

To the extent that Mr. Upchurch maintains that his January 2019 demotion was the result of unlawful retaliation, we can expeditiously dispose of that claim.  There is no evidence in the record before us, voluminous though it surely is, that either Ms. Stultz (who performed the investigation into the November 2018 incident and recommended that Mr. Upchurch be demoted) or Warden Knight (who made the ultimate decision to

demote Mr. Upchurch based on Ms. Stultz's recommendation) was aware at the time the decision was made to demote him that in April 2018 he had previously complained to Deputy Warden Cole regarding the shortage of Black supervisors at CIF.  It is axiomatic that, "if an employer did not know the plaintiff made any complaints, it 'cannot be trying to penalize him for making them.'"  *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 669 (7th Cir. 2006) (quoting *Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 664 (7th Cir. 2005)).

Although Mr. Upchurch has averred generally that he has lodged various complaints about race discrimination at CIF "from 2012 on," he testified at his deposition that he had made these complaints only to other African American co-workers.  In fact, he was unable to identify any specific report of race discrimination that he had made to any supervisor prior to his demotion, with the exception of the April 2018 comment he had made to Deputy Warden Cole and Major Fox.  Dkt. 105-2 at 89; Dkt. 115 ¶ 301.  Because there is no evidence establishing that either Ms. Stultz or Warden Knight knew about Mr. Upchurch's complaint prior to their making the demotion decision, it is plainly true that they could not have retaliated against him on the basis of that complaint.  IDOC is thus entitled to summary judgment on Mr. Upchurch's Title VII retaliation claim based on his January 2019 demotion.

### C.    Failure to Promote or Transfer Following Demotion

#### 1.  Discrimination

Mr. Upchurch also claims that his failure to receive any promotion(s) or transfer position for which he applied following his January 2019 demotion was due to his race.

37

To support this contention, Mr. Upchurch relies heavily on what he characterizes as IDOC's inconsistent enforcement of its policy that employees are ineligible for promotion within the twelve months after their last formal discipline.  Mr. Upchurch argues that regarding the positions for which he was eligible, a reasonable jury could find he was not awarded those positions because of his race, especially in light of what he believes were his superior qualifications.  For the reasons detailed below, we find that the evidence adduced by Mr. Upchurch does not permit such a conclusion.

### a. Periods of Ineligibility

To support his argument that IDOC applied its promotion eligibility policy inconsistently, Mr. Upchurch identifies the treatment of the following employees—Mark Delph, Jared Raines, Joshua Mills, Mr. White, and Mr. Parrow—whom Mr. Upchurch describes as having been similarly-situated white employees.  Each was, he claims, promoted or transferred between IDOC facilities or state agencies despite having been disciplined within the twelve-month period prior to their promotions or transfers.  IDOC rejoins that none of these employees is an appropriate comparator because Mr. Upchurch has failed to establish that any was similarly situated to him in all material respects.

We agree with IDOC that Mr. Upchurch's evidence falls short of establishing that Mr. Delph, Mr. Raines, and Mr. White were similarly situated to him because, unlike Plaintiff, these employees received only informal, not formal, discipline within twelve months after their promotions.  Specifically, the record reflects that Mr. Delph was promoted by CIF to sergeant approximately six weeks after receiving an informal written remand for slapping a male officer on the buttocks; Mr. Raines was promoted to sergeant

within two months of having received a negative fact file entry for swearing over the radio and within two weeks of an informal reprimand for failing to provide offenders bathroom breaks within a two-hour period; and Mr. White was transferred out of CIF to another IDOC facility approximately one month after having taken unauthorized leave for which there has been no showing that he was ever formally disciplined. Because IDOC's policy applies only to formal discipline, the fact that these employees were either promoted or transferred within twelve months of receiving informal discipline does not establish that IDOC failed to consistently apply its promotion/transfer policy.

If Mr. Upchurch maintains here that a reasonable jury could infer discrimination based on IDOC's treatment of these three employees was more lenient than its treatment of him by having imposed only informal discipline rather than formal discipline, that argument has not been sufficiently developed in the briefing before us. Regarding Mr. Delph and Mr. Raines, Mr. Upchurch has failed to explain how their "performance, qualifications, and conduct" were similar "in all material respects" to his, such that their being subjected to informal discipline when he received formal discipline for unrelated transgressions raises an inference that this difference in treatment was due to race. *See Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 274 (7th Cir. 2004).

Mr. Upchurch's contentions with respect to Mr. White are slightly better developed; still the evidence does not permit a finding that Mr. White was a similarly-situated comparator. Mr. Upchurch notes that, less than one month following the November 18th incident Mr. White was allowed to transfer from CIF to another IDOC facility, despite his having taken "much more" unauthorized leave than Mr. Upchurch for

39

which he was never disciplined, while Mr. Upchurch was formally disciplined for his unauthorized leave without any forbearance or forgiveness or other leniency by IDOC, thereby rendering him ineligible for promotion or transfer.  Mr. Upchurch has testified that when he was a lieutenant, he was apprised of the fact that Mr. White had "accrued a lot of ULs, unauthorized leave," (Dkt. 105-2 at 106), but beyond this general assertion, the only specific instance documented in the record of Mr. White's unauthorized leave practices occurred on November 8, 2018, when he took 11.5 hours of sick time, which incident has been explained as follows.

After being informed by then-Captain Parrow that when he took this leave he did not have sufficient sick time available, thereby making him subject to a write up for unauthorized leave, Mr. White responded by email to Major Fox to explain that when he took the leave he had been confused regarding the amount of leave he actually had available.  He therefore apologized and offered to provide a doctor's note justifying his absence.  Mr. White inquired regarding the process for switching the time to authorized leave given those circumstances, to which Major Fox instructed that he should type up his explanation, attach the doctor's note, and submit the request to his captain, who would make a recommendation to Warden Knight, who was the final decisionmaker.  The record does not inform us as to whether Mr. White followed through on those steps, or, if he did, whether his request to switch the time to authorized leave was ever granted.  In any event, there has been no evidence adduced in this record to show that Mr. White was ultimately formally disciplined for that incident thereby making him ineligible for promotion or transfer to another IDOC facility.  Beyond this single instance, Mr.

Upchurch has identified no other specific situation when Mr. White took unauthorized leave or had his unauthorized leave revised to be authorized leave.

In contrast to Mr. White's one documented unauthorized leave violation, Mr. Upchurch received discipline for having taken unauthorized leave on several occasions over the course of his tenure with CIF. Beyond his general complaints that the discipline that he received was unwarranted, there is no evidence to show that on any of those occasions Mr. Upchurch followed CIF's procedures for requesting that unauthorized leave be changed to authorized leave or that having followed those procedures, his request was denied under comparable circumstances to Mr. White's proffer of a doctor's note to excuse his absence. Thus, Mr. Upchurch's and Mr. White's conduct were not sufficiently similar so as to support an inference that the differences in treatment were due to race discrimination against Mr. Upchurch.

Mr. Upchurch also contends that Mr. Parrow's transfer to INDOT approximately six months following his (Parrow's) three-step demotion was violative of IDOC's policy, thus establishing that IDOC applied its policy discriminatorily. However, again the evidence does not support Mr. Upchurch's claim. IDOC never "allowed" Mr. Parrow to transfer to INDOT, which is an entirely separate state agency overseen by entirely different decisionmakers. The evidence reveals merely that Warden Knight confirmed Mr. Parrow's transfer date with INDOT while expressing surprise that INDOT selected him, given his disciplinary record. This evidence falls short of permitting a reasonable factfinder to conclude that Warden Knight influenced INDOT's decision to hire Mr. Parrow or that she otherwise facilitated or orchestrated his transfer out of IDOC. That an

entirely separate state agency (which may or may not have had the same hiring eligibility policy) hired Mr. Parrow within six months of his demotion at CIF is not evidence of race-based discrimination on IDOC's part against Mr. Upchurch.

Finally, Mr. Upchurch seeks to rely on Mr. Mills as a similarly-situated comparator, as Mr. Mills was an employee who was promoted within the twelve month period following receipt of a formal disciplinary action. The evidence shows that in September 2019, Mr. Mills transferred from Pendleton Correctional Facility to CIF to take the position of sergeant, despite having been issued a letter of discipline for a three-shift suspension the month prior. It is undisputed that a suspension is considered formal discipline under IDOC's policies. However, no evidence in the record before us establishes that Warden Knight was aware of this disciplinary action that had been meted out at Pendleton at the time she selected Mr. Mills to fill the sergeant position at CIF. Assuming Warden Knight was aware of Mr. Mills's discipline and selected him nonetheless in derogation of IDOC's policy, evidence of a single policy departure out of 47 employees who have been subjected as a group to hundreds of personnel actions, does not suffice as a basis upon which a reasonable jury could infer that IDOC's failure to promote or transfer Mr. Upchurch within twelve months of his most recent formal discipline was attributable to his race.

Thus, once again, viewing the evidence as a whole, we deem the record devoid of any proof to support Mr. Upchurch's claim that his failure to be promoted or transferred within twelve months of his receipt of formal discipline was due to his race.

### b. Periods of Eligibility

Regarding Mr. Upchurch's exclusion from hiring for any of the positions for which he had applied during the time periods he was eligible for promotion, there is no evidence that his failure to be hired was because of his race.  During the time period relevant to this litigation, Mr. Upchurch applied for two positions with CIF for which he was eligible, to wit, a correctional lieutenant and a correctional captain position, but he was not selected for either.  IDOC's nondiscriminatory reason for Mr. Upchurch's failure to be selected is that the candidates chosen in lieu of him—Brandon Richey and Jerry Gilley— had superior qualifications compared to his.  As referenced above, in the failure to promote context the Seventh Circuit has held that where the employer's proffered non-discriminatory reason for its employment decision "is that it selected the most qualified candidate, evidence of the applicants' competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." *Mlynczak*, 442 F.3d at 1059 (quoting *Millbrook*, 280 F.3d at 1180).  We examine those comparisons below.

IDOC explains that Mr. Richey, who was selected to fill the lieutenant position, was chosen based on his prior experience in working as a sergeant with high-risk offenders at the Pendleton Correctional Facility, a maximum-security facility operated by IDOC.  According to Warden Knight, that kind of experience was viewed as desirable because CIF's population of high risk and violent offenders was increasing at the time of Mr. Richey's selection for the position.  Dkt. 105-9 ¶ 38.  Mr. Gilley, who was selected for the open captain position, had previously served as a captain at CIF before

43

transferring to the Pendleton Correctional Facility.  Warden Knight testified that she

selected Mr. Gilley for the CIF captain position because she viewed his prior experience

in the role as permitting him to "immediately hit the ground running when he returned to

the captain position at CIF."  *Id.* ¶ 39.

Mr. Upchurch maintains that he was far more qualified than both Mr. Richey and

Mr. Gilley, given his longer tenure at CIF along with his record of earning higher

performance ratings.  For a short time, he had also performed the duties of both the

lieutenant and captain positions at CIF when his captain had left IDOC for another job.

Mr. Upchurch's perceptions may be accurate, but an employee's "own opinions about

[his] … qualifications [do not] give rise to a material factual dispute." *Robertson*, 949

F.3d at 381 (quoting *Rabinovitz v. Pena*, 89 F.3d 482, 487 (7th Cir. 1996).  Mr. Upchurch

clearly credits the importance of his familiarity with CIF and his long tenure as more

relevant and more valuable than Mr. Richey's experience with high-risk offenders at

another location and Mr. Gilley's prior stint as a captain at CIF, but his view is not

controlling here.

We do not find Mr. Upchurch's qualifications, impressive as they were, to be so

obviously superior to those of Mr. Richey's or Mr. Gilley's such that in terms of a

comparison there could be "*no dispute* among reasonable persons of impartial judgment

that [he] was clearly better qualified." *Id.* (quotation marks and citation omitted)

(emphasis in original).  Beyond his criticism of Warden Knight's "track record" in not

promoting African American candidates,[8] Mr. Upchurch has identified no other

"weaknesses, implausibilities, inconsistencies, or contradictions" in the IDOC's stated

reasons for selecting Mr. Richey and Mr. Gilley over him such "that a reasonable person

could find [them] unworthy of credence." *Harper v. C.R. England, Inc.*, 687 F.3d 297,

311 (7th Cir. 2012) (quotation marks and citation omitted).  As alluded to previously in

an analogous context, an employer is permitted to "make a calculated business decision

by weighing the relative merits and deficiencies of [the] candidates," *Dunn v. Nordstrom,

Inc.*, 260 F.3d 778, 787 (7th Cir. 2001), and the court "must respect the employer's

unfettered discretion to choose among qualified candidates." *Millbrook*, 280 F.3d at 1181

(quotation marks and citation omitted).

Mr. Upchurch also had applied for positions at other IDOC facilities outside CIF

as well as with other state agencies.  However, neither party has advanced any developed

argument(s) as to the specifics regarding the qualifications, experience, or disciplinary

records of any of the candidates who were ultimately selected for those non-IDOC

positions.  Mr. Upchurch's briefing stopped short of ascribing a discriminatory animus to

the decisionmakers outside CIF, arguing instead that it was "common practice" for

Warden Knight to communicate with officials at other IDOC facilities and state agencies

regarding applicants from CIF who were applying for transfers.  He maintains, therefore,

that she must have tainted the application process against him.  However, Mr. Upchurch

relies only on supposition in making this argument, by assuming that Warden Knight,

---

[8] We note, however, that it was Warden Knight who was the decisionmaker who originally *promoted* Mr. Upchurch to the position of lieutenant.

who he alleges harbored a discriminatory animus against him, must have communicated about him in negative terms with decisionmakers outside CIF. We can identify no evidence beyond his suppositions to support his claim that any such communications actually occurred between Warden Knight and any other decisionmakers at any other IDOC facility or state agency.

Even if there were evidence of such communications by Warden Knight, that evidence would not support the weight Mr. Upchurch seeks to place on it because there is no evidence that any of the non-IDOC decisionmakers made their employment selections based on Warden Knight's input. We acknowledge that there are cases in which a plaintiff "may prevail—even without showing that the ultimate decisionmaker harbored discriminatory bias—by invoking the cat's paw theory of liability." *Sinha v. Bradley Univ.*, 995 F.3d 568, 573 (7th Cir. 2021) (ADEA context). These involve circumstances in which an employee without the explicit power to hire and fire for a particular position, (such as Warden Knight for hiring decisions at other IDOC facilities and state agencies), "nonetheless uses her 'singular influence' over an employee who does have such power to harm the plaintiff for racial reasons, the actions of the employee without formal authority are imputed to the employer and the employer is in violation of Title VII." *Brewer v. Bd. of Trustees of Univ. of Ill.*, 479 F.3d 908, 917 (7th Cir. 2007) (citations omitted).

However, that theory loses traction "if 'the decisionmaker is not wholly dependent on a single source of information and conducts [their] own investigation into the facts relevant to the decision.'" *Sinha*, 995 F.3d at 574 (quoting *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019)). "So long as 'the employer's

investigation results in an adverse action for reasons unrelated to the [other employee's] original biased action … the employer will not be liable.'" *Id.* (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011)).  Here, there is no evidence that any decisionmaker outside of CIF harbored any racial bias or depended solely on an alleged negative appraisal from Warden Knight in deciding not to hire Mr. Upchurch.  Mr. Upchurch has thus failed once again to adduce evidence from which a reasonable jury could find in his favor, either directly or pursuant to a cat's paw theory of liability.

For these reasons, IDOC is entitled to summary judgment on Mr. Upchurch's Title VII discrimination claim alleging his failure to be promoted or to be transferred after his January 2019 demotion.

### 2.  Retaliation

We turn now to Mr. Upchurch's final claim: that his failure to be promoted or transferred since the time of his January 2019 demotion was the result of unlawful retaliation on the part of IDOC.  IDOC claims that Mr. Upchurch was not interviewed for transfer positions or promoted within CIF since January 2019 because his disciplinary record rendered him ineligible for most of the positions for which he applied, and more qualified candidates were selected for the positions for which he was eligible.  Mr. Upchurch, however, argues that a reasonable jury could conclude, based on IDOC's repeated impositions of formal discipline on him following each complaint he made of race discrimination, rather than opting to impose informal discipline for which the sanction of ineligibility of promotions/transfer was not a consequence, was a decision made in retaliation for his having engaged in statutorily protected activity.  In other

words, the decision to come down hard on him every time he was sanctioned for a workplace infraction by giving him a higher level of punishment knowing that would foreclose other job opportunities was an action taken by IDOC in retaliation for his having filed complaints for discrimination.

To survive summary judgment on this claim, Mr. Upchurch must be able to establish that "he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Lauth v. Covance, Inc.*, 863 F.3d 708, 716 (7th 2017) (citation omitted). "A retaliation claim under Title VII requires a plaintiff to establish 'that his or her protected activity was a but-for cause of the alleged adverse action by the employer,'" *Gnutek v. Ill. Gaming Bd.*, 80 F.4th 820, 824 (7th Cir. 2023) (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)), meaning "that the adverse action would not have happened *without the activity*." *Xiong v. Bd. of Regents of Univ. of Wis. Sys.*, 62 F.4th 350, 355 (7th Cir. 2023) (quotation marks and citation omitted) (emphasis in original).

As noted, Mr. Upchurch's retaliation claim turns on the instances when he was disciplined for workplace infractions following his January 2019 demotion. While Mr. Upchurch has presented evidence showing that on those occasions when IDOC disciplined him the sanctions were imposed shortly after he had complained of race discrimination in connection with his demotion, "[o]n summary judgment, in particular, 'it is clear mere temporal proximity is not enough to establish a genuine issue of material fact.'" *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) (quoting *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004)).  Here, Mr.

48

Upchurch has failed to adduce evidence beyond the temporal proximity sufficient to raise an inference of retaliation.

Mr. Upchurch does not deny engaging in the misconduct for which he was disciplined, to wit, having refused mandatory overtime without available refusals twice within one week and having been late or absent on the days he was formally written up for unauthorized leave violations.[9]  He contends that he should not have been disciplined as harshly as he was for those infractions.  He argues that in each instance when discipline was meted out a choice was necessarily made by his supervisor as to the level of discipline he should receive, to wit, whether he should receive "formal" discipline, rather than "informal" discipline.  And he always was given the harsher punishment, which was done intentionally, he says, because pursuant to existing personnel policies in effect at IDOC, the consequence of his receiving "formal" discipline was to render him ineligible for transfer or promotion to other, presumably better jobs with IDOC for some stated period of time thereafter.  In Mr. Upchurch's case, these periods of ineligibility overlapped, running from March 26, 2019 through March 26, 2020 and again from July 17, 2020 through February 3, 2022.  That meant that over these time periods he was ineligible for promotion or transfer.  Mr. Upchurch contends that this pattern of imposing on him the more serious level of "formal" discipline was a strategy pursued intentionally by his supervisors at IDOC in retaliation for his having filed civil service complaints

---

[9] Mr. Upchurch does deny bring tobacco into CIF on the occasion he was disciplined for doing so, but he connects that discipline with his having been off work for a month with COVID, not to any complaint of race discrimination.

against IDOC and complained in general terms that there was a dearth of Black supervisors within the system.

Thus, while he has established that he had engaged in protected activity by lodging his complaints about discrimination and that he suffered an adverse employment action, he fails to show, based on the paucity of evidence in this record that his complaints were the but-for cause of the adverse action by IDOC.  Mr. Upchurch has failed to adduce sufficient facts to support such an inference.  He has relied heavily on evidence that he contends establishes that similarly-situated employees were treated more leniently by IDOC because they received only informal discipline for equal or more serious infractions.  But, as we have already addressed in connection with his discriminatory failure-to-promote claim, the employees he has identified as having been more favorably treated were not in fact similarly-situated to him.  Because his purported comparators are not similarly-situated in all material respects, the fact that they may have been treated differently is not probative of retaliation.  Beyond his contentions regarding these unsuitable comparators, Mr. Upchurch has developed no argument regarding how any other IDOC employees were treated vis-à-vis decisions on imposing formal versus informal discipline or data regarding the frequency of instances of "formal" discipline compared with "informal," that might support his retaliation claim.

We also do not know, for example, whether the terms and conditions of IDOC's policy regarding formal and informal discipline and its implementation were vested entirely to a supervisor's discretion or whether other guidelines and directives, such as

progressive discipline,[10] applied to lessen the supervisors' discretion.  Similarly, we do not know whether particular sanctions were determined on the basis of the seriousness or the frequency of the workplace infractions.  Nor do we know whether the decision to impose formal versus informal discipline could have been challenged through an appeal or otherwise grieved by the affected employee and, if so, whether Mr. Upchurch ever attempted such a review or otherwise formally challenged the actions to his IDOC administrators/supervisors.

Mr. Upchurch has failed to adduce evidence from which a reasonable jury could infer that his adverse employment action could have occurred as a form of retaliation, never mind that it actually did.  We are left with little more than a theory of liability advanced by Mr. Upchurch against IDOC dressed up as a claim of retaliation.  Mr. Upchurch's previous engagement in statutorily protected activity does not automatically insulate him from subsequent discipline for legitimate infractions and it is up to the employer to determine the nature and extent of such discipline, so long as it is not motivated by or a cover for retaliation.  Resisting as we must the Court's serving "as a super-personnel department" by substituting its judgment for how the disciplinary processes at IDOC should be implemented, so long as there is no evidence in the record (as is the case here) to show or suggest that a retaliatory animus was at the heart of

---

[10] Certain of Mr. Upchurch's disciplinary letters reference him being subject to "progressive discipline," but no further details regarding the specifics of such a policy have been elucidated by the parties.

IDOC's disciplinary decision making, we must and shall defer to the employer's policies and decision-making.

In the absence of evidence on the basis of which a jury could conclude, if it chose to do so, that but for Mr. Upchurch's complaints of discrimination, he would not have been disciplined or at least would not have received "formal" discipline as a sanction for having refused to perform the mandatory overtime and having taken unauthorized leave and would thus have been entitled to apply for promotions to other positions at IDOC or a transfer to another IDOC facility, Mr. Upchurch's retaliation claim as to the positions for which he was not eligible based on his disciplinary record cannot survive summary judgment.  Moreover, without evidence from which a reasonable jury could conclude that Mr. Upchurch's discipline was imposed as a ruse for retaliation, his claim that his failure to be selected for any IDOC promotions or transfers during the periods of time he *was* eligible for selection was part of a retaliatory campaign against him is without evidentiary support.  Accordingly, IDOC's motion for summary judgment on Mr. Upchurch's retaliation claim must also be granted.

## III.   Conclusion

For the reasons detailed above, Defendant's Motion for Summary Judgment [Dkt. 130] is <u>GRANTED</u>.  Final judgment shall issue accordingly.

IT IS SO ORDERED.

Date:   _____2/7/2024_____

*Sarah Evans Barker*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Richard L. Darst
COHEN GARELICK & GLAZIER
rdarst@cgglawfirm.com

James Alex Emerson
COOTS HENKE & WHEELER, P.C.
aemerson@chwlaw.com